UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILFRED JULCE, as SPECIAL PERSONAL REPRESENTATIVE OF THE ESTATE OF JEANICA JULCE, )<br>Plaintiff, )<br>)<br>v. )<br>)<br>RYAN DENVER, )<br>Defendant/Cross-Claim Plaintiff, )<br>)<br>v. )<br>)<br>LEE ROSENTHAL, )<br>Defendant/Cross-Claim Defendant, )<br>)<br>And )<br>)<br>RYAN DENVER, )<br>Third-Party Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA, )<br>Third-Party Defendant. ) | Civil Action No. 1:2025cv11146 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXTEND SCHEDULING ORDER AND FOR COSTS AND SANCTIONS FOR DISCOVERY ABUSE**

Plaintiff Estate of Jeanica Julce ("Plaintiff" or "Estate") submits the following Memorandum of Law in Support of its Motion to Extend Scheduling Order and for Costs and Sanctions for Discovery Abuse. Plaintiff moves that all current Scheduling Order deadlines be extended by 90 days. Defendants Lee Rosenthal and Ryan Denver, Third-Party Defendant United States, and Plaintiffs Aristide Lex, Mussa Kassa, Marzouk Onifade all assent to the extension.

1

Plaintiff also moves for an order that Defendant Lee Rosenthal comply with basic rules of discovery and immediately supply Plaintiff with all the information to which Plaintiff is entitled, together with other additional discovery sanctions. The complete grounds for the motion are set forth in the accompanying Memorandum of Law. Defendant Lee Rosenthal opposes this request.

**INTRODUCTION**

Jeanica Julce was 27 years old. She was beautiful, vibrant, and brimming with life. A lifelong dancer, she performed frequently with various dance troupes and taught dance to inner-city kids. She was working hard for a hospitality group, saving money to follow her dream and open her own dance studio. Then, in the cold waters of Boston Harbor on July 17, 2021, Defendant Lee Rosenthal ("Defendant" or "Rosenthal") ran her over with his speedboat. Propeller wounds marred multiple parts of her body as she sank to the bottom of the harbor.

For many years, Rosenthal was content to sit back and watch as the law focused its attention on the person who was responsible for putting Jeanica Julce in the water in the first place, Ryan Denver. Between a stay of proceedings caused by a Limitation Action in this court, and another stay of proceedings stemming from a parallel criminal case against Ryan Denver in Suffolk County Superior Court, it was easy enough for Rosenthal to avoid attention. But there should be no mistake: Lee Rosenthal killed Jeanica Julce, and, but for Lee Rosenthal's reckless actions on that July night, Jeanica Julce would still be alive today. Finally, only nine months ago (July 2025), and four years after Jeanica's death, the various stays in the case were lifted and the Estate was free to conduct discovery with Rosenthal. Unfortunately, as has become clear, without any stays left to protect him, Rosenthal has resorted to other bad faith tactics as he tries everything he can to keep the truth from coming out.

2

From the outset of discovery, Rosenthal has engaged in a campaign of delay, obfuscation, non-responsiveness, and outright misrepresentation that has required Plaintiff to repeatedly seek supplementation of what should be rudimentary responses. Defendant's tactics have resulted in the Plaintiff being deprived of fundamental information, to the point where Plaintiff has been unable to complete discovery within the current scheduling deadlines. As just one glaring example, Plaintiff was previously advised, in response to discovery requests served on the Defendant back in August 2025, that Rosenthal's vessel had been sold and was unavailable for inspection. Just days ago, on Friday, March 27, 2026, Rosenthal informed Plaintiff, for the first time ever, that the vessel is still owned by the Defendant's father, Steven Rosenthal, and is available for inspection. Even more recently, on April 1, 2025, a witness who was with the Defendant throughout the night in question testified that the Defendant was purchasing and consuming alcohol at various points in the night, despite Defendant's Answer to Interrogatory No. 9, wherein he stated under oath that he had neither purchased nor consumed <u>any</u> alcohol for 24 hours prior to the incident. And this is just the beginning.

## STATEMENT OF RELEVANT FACTS

### I.    The wrongful death of Jeanica Julce

At approximately 3:00 a.m. on July 17, 2021, Jeanica Julce was floating in a life ring in the waters of Boston Harbor. The vessel she had been on, piloted by Defendant Ryan Denver, had collided with Daymarker No. 5 and capsized. Ms. Julce did not have any visible wounds to her head, face, neck, shoulders, or arms. According to various records and Coast Guard recordings, a nearby tugboat, the "Stephen J. Leaman," noticed the commotion in the water and notified the Coast Guard. The Coast Guard immediately sent distress calls over the radio (Channel 16). Shortly thereafter, another vessel, the "Defensive Indifference," came upon the scene. The

"Defensive Indifference" was operated by Defendant Lee Rosenthal and was owned by his father, Steven Rosenthal. The vessel is a Jupiter 31 center console with twin outboard motors.

As is only now becoming clear, according to a witness who was with the Defendant over the course of the evening, Lee Rosenthal had been out celebrating his brother's birthday with several of his brother's friends. See generally Exhibit 1, Josephson Deposition. The celebration started at the Hong Kong restaurant in Harvard Square, famous for strong and intoxicating Scorpion Bowls and karaoke, and then moved to Ned Devine's near Faneuil Hall, famous for all kinds of things. Lee Rosenthal was drinking and buying rounds of drinks. The celebration lasted for many hours. The group (minus Lee's brother, who went home, but plus two young women the group met at Ned Devine's) left Ned Devine's and walked to Fan Pier, where the "Defensive Indifference" was docked. Lee Rosenthal used his access key to unlock the Fan Pier gate and then used his boat key to operate the "Defensive Indifference." The plan was to take a pleasure cruise around the harbor. As the "Defensive Indifference" headed out into the harbor, the odor of burning marijuana was detected from the helm, where Rosenthal was piloting the boat.

Shortly after heading into the harbor, the "Defensive Indifference" entered the area where Jeanica Julce was floating. Those onboard observed at least two people holding onto the Daymarker. They were able to observe a man swimming in the water (Ryan Denver). The "Defensive Indifference" got close enough to this man for passengers to be able to observe blood on his head and converse with him. The man said that there were other people still in the water and to go help rescue his friends. Ms. Julce was still in the water, as was another passenger from Denver's vessel. Instead of assisting, and true to its name, the "Defensive Indifference" increased speed and left the area, heading in the direction where Jeanica Julce was floating. In so doing, the captain of the "Defensive Indifference," Lee Rosenthal, violated federal law and failed to assist

4

with any type of search and rescue.  Rescue vessels had not yet arrived in the area.  The "Defensive Indifference" and the path it traveled, are visible on FLIR surveillance footage from a nearby Massport terminal, in the possession of all parties.

Of the eight people onboard Denver's vessel that evening, seven were eventually rescued. Despite an extensive search and rescue effort by the Coast Guard and various police agencies, Jeanica Julce did not survive.  Her body was found by divers at the bottom of the harbor approximately eight hours after the initial allision with Daymarker No. 5.  An autopsy was performed by the Office of the Chief Medical Examiner, with many photographs taken.  Cause of death was determined to be drowning in the setting of other wounds to the body.  These wounds include certain wounds to Julce's head, shoulder, ankle, and back, among others.  Expert consultation has confirmed, without question, that these wounds are consistent with propeller strikes.  There is only one vessel that could have caused these propeller wounds: "Defensive Indifference."

**II.    Plaintiff's efforts to obtain information to support her claims against Lee Rosenthal and his deliberate refusal to comply with the Rules governing discovery**

A. Paper Discovery

There have been misrepresentations from the beginning of discovery.  Rosenthal served automatic disclosures per Rule 26 on July 29, 2025.  Exhibit 2, Rosenthal Initial Disclosures.  The disclosures were deficient on their face.  Despite knowing full well that there were two female passengers on his vessel on the night in question, Rosenthal's disclosures to the Plaintiff failed to identify these two women (see Fed. R. Civ. P. 26(a)(1)(A)(i)).[1]  Despite the fact that Rosenthal's

---

[1] Rosenthal informed his insurance company of the presence of these two women in writing on March 29, 2022.  See C.A. No. 1:22-cv-11401-ADB, ECF# 1-7 (p. 2).

counsel has claimed he was "home with his wife" on the night in question, and was not out celebrating his brother's birthday before boarding his vessel (together with several of his brother's friends), Rosenthal failed to identify his wife as a witness or list the subjects of information she might have (see Fed. R. Civ. P. 26(a)(1)(A)(i)).  Exhibit 3, Affidavit of Benjamin H. Duggan. Under Rule 26, this is information that is required to be provided without any formal request.  Lee Rosenthal did not even list Steven Rosenthal, the owner of the vessel "Defensive Indifference," which is the subject of this case, as a person that may have discoverable information.

There have also been glaring omissions with regard to insurance, starting with initial disclosures and continuing to the present.  The Federal Rules require disclosure of "any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment." Rules Fed. R. Civ. P. 26(a)(1)(A)(iv).  In his initial disclosures, however, Rosenthal only produced certain declaration pages, not full policies, and the declaration pages he did provide were redacted to exclude fundamental information, including the named insureds on the policies. Exhibit 2, Rosenthal Initial Disclosures.  Rosenthal also failed to provide any of the reservations of rights letters he had received.  Plaintiff then served paper discovery.  Interrogatory No. 2 asked the Defendant to "[i[dentify all insurance carriers or self-insured funds, by name, address, policy numbers, and policy limits, for any insurance policy or fund that may provide coverage for any judgment entered against you related to this occurrence[,]" and in addition to identify any "indemnification or contribution agreements between any of the parties" if the Defendant was aware of any such agreement.  Document Request No. 2 asked the Defendant to provide "any documents…identified in or related to" his response.  Again, under Rule 26, this is information that should have been provided without any formal request.  The Plaintiff has gradually obtained insurance information, not in one production, but piecemeal, including as a result of a motion to

6

compel (see ECF# 26). These documents include copies of the applicable insurance policies, multiple Reservations of Rights letters and the un-redacted Declaration of Coverage pages. And yet, the information regarding insurance is not yet complete. The Plaintiff just learned for the first time, after production of unredacted policies, that the second excess or umbrella policy which might apply (for an additional $5M in coverage) was issued not to the owner of the boat but to the Defendant himself. It was this policy that also provided information on yet another underlying insurance policy, which was apparently issued to the Defendant, which provides an additional $2M in coverage (issued by Chubb). Exhibit 4, insurance documentation. This $2M Chubb policy has *never been mentioned* during the multiple discussions and exchanges between counsel. To date, Rosenthal has failed to supply any documentation about the $2M Chubb policy. Plaintiff should not be required to spend hours trying to dissect these policies, guessing as to whether they are complete or if someone else has another policy. It should have been simple to serve all of the policies, unredacted, on Plaintiff and to identify them in answers to interrogatories. Fundamental insurance information about an entire Chubb policy is still missing.

Interrogatories and document responses have also been answered in bad faith and subject to multiple delays. Interrogatories and document requests were served on August 5, 2025. On August 29, 2025, Rosenthal requested an extension to October 6, 2025, which was granted. Rosenthal was fully aware that Plaintiff had noticed the deposition of Evan Casalino, one of the men on Rosenthal's vessel on the night in question, for November 14, 2025. Exhibit 5, email string. On October 6, 2025, Rosenthal requested another extension to the end of October. Plaintiff agreed to this but reminded counsel that discovery responses were needed prior to the November 14, 2025, deposition. Exhibit 6, email string. Rosenthal continued to delay, to the point where a Rule 7.1 letter became necessary on November 12, 2025, forcing Plaintiff to postpone the

deposition of Evan Casalino (now re-scheduled for April 19, 2026) until the necessary information has been received.  Exhibit 7, Rule 7.1 Letter.  In response to the 7.1 letter, Rosenthal asked for yet more time, and ultimately produced interrogatory answers on December 17, 2025, and document responses on December 18, 2025, more than four months after service.  As is often the case when a deposition gets postponed, the delay of the Casalino deposition stalled other avenues of discovery, and Plaintiff had been deprived of important information for months that will ultimately lead to other areas of inquiry.

When discovery responses finally did come in December 2025, they were woefully inadequate.  Document Request No. 36 stated: "Please produce your vessel for a physical inspection at a mutually convenient time and place."  Rosenthal responded on December 18, 2025: "The vessel has been sold."  Exhibit 8, Rosenthal Document Responses.  Incredibly, on March 27, 2026, for the first time ever, Rosenthal's counsel called Plaintiff's counsel and stated there had been "confusion," and that the vessel had never been sold but was, in fact, still in the possession of Steven Rosenthal.  Exhibit 3, Duggan Affidavit.  The practical result of this purported "confusion" means that an inspection that should have taken place months ago has yet to be performed, and various witnesses, particularly experts, do not yet have important information about the boat in question.  This, of course, delays even further the experts' ability to render final opinions.  It also means Plaintiff does not yet have all the information she needs to even determine what experts may ultimately be necessary.  Even more concerning is the fact that Rosenthal's counsel also stated during the call that the boat had been "repowered" at some point, meaning that the motors and propellers on the vessel on the night in question may no longer be with the vessel.

Exhibit 3, Duggan Affidavit.  This may result in a serious spoliation issue.[2]  It also means even more time may be needed to track down these motors and propellers, inspect them, and get this information to experts.  To date, Rosenthal has not supplied a single document concerning the vessel's title, or any sale of any part of the vessel.

Interrogatory No. 9 to Rosenthal asked: "State whether you consumed any alcoholic beverages or drugs, whether prescription, over-the-counter or illicit, within twenty-four (24) hours prior to the occurrence.  If the answer is in the affirmative, state the name of the substance, where and when it was obtained and consumed, and the amount thereof."  Rosenthal answered this interrogatory on December 17, 2025, under the pains and penalties of perjury, with one word: "No."  Exhibit 9, Rosenthal's Answers to Interrogatories.  In fact, Rosenthal was out at two bars, drinking and buying drinks, before boarding his vessel on the night in question.  Rosenthal's answer is not just demonstrably and obviously untruthful, it has also delayed the progress of discovery.  Had Rosenthal answered the interrogatory truthfully in December 2025, subpoenas for records could have been sent to the bars immediately.  Instead, these subpoenas are only being served now.

The inappropriate discovery responses do not end there.  Despite specific interrogatory questions regarding his cell phone, and repeated follow-up requests, Rosenthal has only just produced his phone number and phone provider today (in direct response to this motion), meaning Plaintiff has been unable to subpoena Rosenthal's phone records from the night in question. The

---

[2] Many unanswered questions remain concerning the vessel and the whereabouts of its various parts.  Plaintiff is only just beginning to arrange for necessary inspections.  Steven P. Rosenthal, father of the Defendant Lee Rosenthal and owner of the "Defensive Indifference," is a licensed Massachusetts attorney and an Officer of this Court.  Depending on how this investigation progresses, Plaintiff reserves the right to seek any appropriate amendments to her complaint, including the addition of claims against Lee Rosenthal and Steven Rosenthal.

same goes for Rosenthal's credit card records for the night in question.  Rosenthal has still yet to describe anywhere in writing where he was before boarding the vessel, what he was doing, why he decided to take the boat out in the middle of the night, where he went after disembarking, and what he did.  Rosenthal's interrogatory answers also did nothing to supplement the witness list supplied by Rosenthal's initial disclosures, meaning his interrogatory answers were just as deficient as his initial disclosures.  All of this is basic, rudimentary information.  When Rosenthal requested four months of extensions to respond to written discovery, Plaintiff expected (and was entitled to expect) that Rosenthal would serve answers under oath in accordance with the federal rules.  Instead, it has become patently clear that Rosenthal simply intends to engage in this shell game for as long as he can get away without it.

Rosenthal's conduct has already necessitated a motion to compel.  On March 6, 2026, Plaintiff's counsel sent Rosenthal's counsel a lengthy Rule 7.1 letter outlining Rosenthal's various discovery deficiencies and advising counsel that a motion to compel would be filed on March 13, 2026, in the absence of supplementation.  Exhibit 10, Rule 7.1 Letter (3/6/2026).  Rosenthal made no response.  On March 12, 2026, Plaintiff's counsel followed up.  Rosenthal's counsel replied, "thank you for the reminder on this" and asked for yet more time to serve supplemental responses.  Exhibit 11, email string.  Plaintiff filed the motion on March 13, 2026 (ECF# 26).  Rosenthal filed an "opposition" on March 27, 2026, (ECF #28), wherein he agreed that he needed to supplement his discovery.  To date, however, Rosenthal has failed to supplement and has not sent anything to Plaintiff since filing his "opposition."

B. <u>DEPOSITIONS</u>

Deposition scheduling has also been unnecessarily difficult.  Plaintiff served a deposition notice on Lee Rosenthal on January 15, 2026, requiring his presence at a deposition on February

10, 2026. That same day, January 15, 2026, Rosenthal's counsel emailed and said February 10, 2026 did not work, but that new dates would be sent. Exhibit 12, email string. Months went by without any suggested dates, despite repeated emails following up. See Exhibit 13, emails strings. Finally, on March 6, 2026, Plaintiff's counsel simply re-noticed the deposition to April 16, 2026. Rosenthal has yet to confirm whether he will attend on that day.

Lee Rosenthal's father, Steven Rosenthal (owner of the vessel in question), was served on March 12, 2026 at his Marblehead home with a deposition subpoena to appear on March 30, 2026. On March 25, 2026, counsel for Rosenthal emailed that he would be representing Steven Rosenthal and that March 30, 2026 did not work. Counsel promised to send April dates. Exhibit 14, email string. So far, no dates have been suggested.

Lee Rosenthal's brother, Alex Rosenthal (whose birthday was being celebrated on the night in question), was served on March 12, 2026 at his Marblehead home with a deposition subpoena to appear on March 30, 2026. Neither Alex Rosenthal nor any attorney representing him contacted Plaintiff's counsel prior to March 30, 2026. The deposition was convened on March 30, 2026, Alex Rosenthal did not appear, an appropriate record was made, and the deposition was suspended. Exhibit 15, Alex Rosenthal Deposition. Lee Rosenthal's counsel suggested at the deposition that Alex Rosenthal lived in New York, not Marblehead (despite evidence to the contrary). As was pointed out at the deposition, even if that were true, it would have been the simplest thing in the world for Lee Rosenthal's attorney to simply supply a New York address for the witness.

The pattern is clear. Lee Rosenthal is foot-dragging, while offering only non-responses and misrepresentations, hoping to "run out the clock" and leave the Julce family at a disadvantage.

**ARGUMENT**

I.    **Rosenthal's Continued Violation of the Federal Rules of Civil Procedure
       and This Court's Scheduling Orders Warrants Sanctions**

From the inception of discovery, Defendant Rosenthal has failed to comply with the Federal Rules of Civil Procedure and this Court's scheduling orders, including with regard to initial disclosures, answers to interrogatories, and document responses, actively thwarting Plaintiff's investigation and necessitating a Motion to Compel.  Meanwhile, this interference (and other acts) has greatly affected the Plaintiff's ability to complete depositions.

Rule 37 provides a wide range of sanctions for discovery abuse, including things like establishing facts, prohibiting claims, defenses, or evidence, striking pleadings, dismissal or default. *See* Fed. R. Civ. P. Rule 37(b).  It is a "well established principle that discovery orders, other pre-trial orders, and, indeed, all orders governing the management of a case are enforceable under pain of sanction for unjustifiable violation." *See Barreto v. Citibank, N.A.*, 907 F.2d 15, 16 (1st Cir. 1990). Noncompliance with discovery orders can result in dismissal or default. *See e.g.*, *Damiani v. Rhode Island Hosp.*, 704 F.2d 12 (1st Cir. 1983) (upholding dismissal); *Hooper-Haas v. Ziegler Holding, LLC* 690 F.3d 34 (1st Cir. 2012) (upholding default).

Indeed, as the First Circuit has reaffirmed, "a party who flouts a court order does so at its own peril." *See Hooper-Haas*, 690 F.3d at 37. When "faced with a disobedient litigant [the court] has wide latitude to choose from among an armamentarium of available sanctions." *See id*. Severe sanctions, like default or dismissal, "provide[] a useful remedy when a litigant is confronted by an obstructionist adversary and play[] a constructive role in maintaining the orderly and efficient administration of justice." *See Remexcel Managerial Consultants, Inc. v. Arlequin*, 583 F.3d 45, 51 (1st Cir. 2009) (internal quotation marks omitted) (quoting *KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 13 (1st Cir. 2003); *see also*, *Hooper-Haas*, 690 F.3d at 38.

While such severe sanctions "should be employed only when...misconduct is extreme...disobedience of court orders, in and of itself, constitutes extreme misconduct." *See*

12

*Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 46 (1st Cir. 2002). That same "principle applies with undiminished force to scheduling orders." *See id*. As the calendar is crowded, the court must take "an active role in case management" for efficiency. *See id*. Thus, "scheduling orders are essential...and a party's disregard of such orders robs them of their utility." *See id*. As such, "litigants have an unflagging duty to comply with clearly communicated case-management orders." *See Rosario-Diaz v. Gonzalez*, 140 F.3d 312, 315 (1st Cir. 1998); *see also*, *Tower Ventures, Inc.*, 296 F.3d at 46 (quoting the same). Further, "[r]epeated disobedience of a scheduling order is inherently prejudicial, because disruption of the court's schedule and the preparation of other parties nearly always results." *Robson v. Hallenbeck*, 81 F.3d 1, 4 (1st Cir. 1996).

Two examples provide guidance.  First, in *Hooper-Haas v. Ziegler Holdings, LLC*, the First Circuit found the defendant's noncompliance with scheduling orders warranted default. *See generally, Hooper-Haas*, 690 F.3d 34 (2012). There, the district court issued an initial scheduling order, requiring the parties to meet and confer and exchange discovery, and set dates for the filing of pretrial memoranda and a pretrial conference. *See id*. at 36. At the conference, defendant's counsel advised the district court that they were unable to meet these deadlines, as they were unable to reach their client. *See id*. Defendant's counsel was rebuked for missing deadlines and advised that noncompliance would not be tolerated. *See id.* They were provided with a second chance: the court set new dates.  *See id*. The pretrial memorandum deadline passed, and the defendant had not filed its memorandum or made its required disclosures. *See id*. at 37. Plaintiffs moved for entry of a default as a sanction, which went unopposed. *See id*. It was awarded. *See id*. The district court ultimately found defendant's misconduct willful and concluded that its "repeated failures to respond to discovery requests and to comply with the court's scheduling order were efforts 'to

unjustifiably delay the proceeds.'" *See id*. The First Circuit upheld the entry of default as a sanction. *See id*. at 39, 41.

Second, in *Damiani v. Rhode Island Hosp.*, the court found that the plaintiff's noncompliance with a discovery order warranted dismissal. *See generally*, *Damiani*, 704 F.2d 12 (1st Cir. 1983). There, plaintiff was served with interrogatories and document requests and failed to respond within the required timeframe. *See id*. at 13. Thereafter, the defendants moved to compel responses by a certain date, the plaintiff failed to oppose it, the district court granted the motion and a show cause hearing as to why defendant's attorney's fees and costs should not be awarded was set. *See id*. Plaintiff then failed to comply with the order and on the due date for compliance, July 27, informed defendant he was on trial and a would serve the interrogatories by August 3, he failed to comply with that date as well. *See id*. Over the next two months, Plaintiff's counsel continued to have excuses for not completing discovery.  When he did submit interrogatories, defendant argued that "the interrogatories were 'woefully inadequate'" and plaintiff explained that he was engaged in a trial and that his client was unable to "meet with him as scheduled because of emergency situations at the hospital." *See id at 14.*  The district court emphasized the need for strict compliance with court orders and expressed reluctance regarding pretrial dismissal but noted, "[m]aybe we have reached the point where we have got to start thinking in such drastic terms." *See id*. (brackets in original). Defendant's counsel was awarded fees for the motion and the district court reserved ruling on dismissal, giving plaintiff's counsel three weeks to oppose. *See id*. After subsequent hearing, the case was dismissed.  *See id*.  In upholding the dismissal, the First Circuit specifically noted that, "[i]n this case we have criticized unilateral inaction without court approval," and closed its opinion by stating that counsel is first obligated "to make every effort to comply" with court orders, then, if compliance is impossible,

seek consent, and, then, finally, "seek court approval for noncompliance based on a truly valid reason." *See id.* at 17.

With the above in mind, examples abound where parties, by and through their conduct during discovery, were either sanctioned or had their cases dismissed entirely. *See e.g., Novi Footwear International Co., Limited v. Earth OpCo LLC*, 740 F. Supp. 3d 73 (D. Mass 2024) (sanctions awarded to plaintiff for defendants' considerable delay in complying with discovery obligations, where fact discovery unusually drawn-out, necessitating several extensions, and delays largely one sided); *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29 (1st Cir. 2001) (failure to comply with Fed. R. Civ. P. Rule 26(a) automatic disclosure, without substantial justification and not harmless to opposing party, resulted in exclusion of expert testimony under Fed. R. Civ. P. Rule 37(c)); *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc.,* 982 F.2d 686, 691–92 (1st Cir. 1993) (upholding dismissal, with prejudice, of counterclaims and cross-claims under Fed. R. Civ. P. Rule 16(f) for party's failure to appear at scheduled pretrial and settlement conference, failure to prepare pretrial order, and failure to otherwise comply with court's orders).

Here, Rosenthal's conduct warrants sanctions.

### A.     Rosenthal's Initial Disclosures Violated Fed. R. Civ. P. Rule 26(a)(1)(A) and Have Not Been Supplemented

First, Rosenthal's initial disclosures under Fed. R. Civ. P. Rule 26(a)(1)(A) were wholly insufficient. Initial disclosures are designed to provide basic, necessary information. At the outset, "a party must, without awaiting a discovery request," provide initial disclosures. *See* Fed. R. Civ. P. Rule 26(a)(1)(A). This disclosure is made, "based on the information then *reasonably available*" to the party. Fed. R. Civ. P. Rule 26(a)(1)(E) (emphasis added). Having "*not fully investigated the case*," "the sufficiency of another's...disclosures," or another party "hav[ing] not made its

15

disclosures" are all *unacceptable excuses* for failing to disclose the information required by the rules. *See* Fed. R. Civ. P. Rule 26(a)(1)(E) (emphasis added). In other words, parties must obtain the requisite information and exchange it. Doing nothing, hiding the ball or playing games at the outset is a clear violation of the rules. Moreover, the duty relating to these disclosures does not simply end after they are made. Rule 26(e)(1) requires a party to supplement its initial disclosures "if the party learns that in some material respect the disclosure or response is incomplete or incorrect." *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 290 F.R.D. 11, 18 (D. Mass. 2013).

Rosenthal failed to identify key witnesses, he failed to identify insurance information, and he failed to supplement with any additional information. Even today, Plaintiff is still missing pertinent insurance information. Thus, Rosenthal—in both failing to adequately identify witnesses and available insurance—has violated Fed. R. Civ. P. Rule 26. Further, Rosenthal has a continuing duty to supplement or correct its initial disclosures and has failed to do so. *See* Fed. R. Civ. P. Rule 26(e)(1)(A).

> **B.** **Rosenthal's Has Either Wholly Failed to Respond to Discovery Requests or Provided Misleading Information**

After failing to adequately provide initial disclosures, Rosenthal repeated its behavior in responding to Plaintiff's written discovery requests. After being granted multiple extensions, complying with none of them, and, ultimately, being served a Rule 7.1 letter, Rosenthal eventually served Plaintiff with its initial interrogatory answers and document responses. Behavior, in kind to that seen in *Damiani*, wherein the party "'repeatedly promised to comply with his opponent's discovery requests and repeatedly broke his promises,'" and indicative of "an 'arrogant attitude that even his self-imposed deadlines were made to be broken, that discovery could proceed at the pace he desired." *See Damiani*, 704 F.2d at 15.

16

This delay, notably, resulted in a key deposition having to be postponed and rescheduled several months later, which, inevitably, will disrupt and delay Plaintiff's investigation of this matter. The interrogatory answers and document responses, much like the initial disclosures, were wholly insufficient and, at times, inaccurate (akin to the "woefully inadequate" interrogatories in *Diamani*). *See Damiani*, 704 F.2d at 14.

Rosenthal provided non-responsive or inaccurate interrogatory answers. He has failed to produce documents.  In short, Rosenthal has "arrogated control of discovery to himself and changed the date of compliance to suit his own convenience." *See Damiani*, 704 F.2d at 16. Perhaps, most glaringly, and harmful to Plaintiff's case is the recent information regarding the boat in question.  Rosenthal has, in effect, successfully delayed discovery at every turn, unnecessarily drawing out the discovery process, necessitating extensions and delays that are, largely, caused by them. Such behavior warrants sanctions. *See e.g.*, *Novi Footwear International Co., Limited*, 740 F. Supp. 3d 73 (D. Mass 2024) (defendants sanctioned for considerable delay in discovery compliance, unusually drawing out fact discovery, necessitating several extensions, and delays largely one-sided).

### C.    Rosenthal Has Actively Thwarted the Parties' Deposition Schedule

As with the initial disclosures and its responses to Plaintiff's discovery demands, Rosenthal has made the deposition schedule needlessly burdensome, by changing dates, claiming witnesses were not served, etc.   Rosenthal's behavior appears designed, purposefully, to thwart Plaintiff's investigation. At every turn, Rosenthal has attempted to stall, delay, or run out the clock on any aspect of Plaintiff's investigation that involves Rosenthal. By actively thwarting Plaintiff's deposition schedule, Rosenthal is trying to ensure that a thorough investigation is not undertaken,

and that, by the time that investigation gets underway, it will be done under the pressure of a closing discovery schedule.

CONCLUSION

Rosenthal's behavior, thus far, "casts a shadow on the bona fides" of his defense. *See Damiani*, 704 F.2d at 16. In fact, it "amount[s] to willful misconduct," is "'intentional and not reasonably justified,' and constitute[s] 'a willful dereliction of counsel's responsibility both to this court and to defendants.'" *See id.* at 14-15. Rosenthal, as previously discussed, is attempting to "arrogate[] control of discovery" to suit Rosenthal's needs, wholly disregarding Plaintiff's right to obtain basic information. *See id.* at 16.

Sanctions exist, "not merely to penalize...but to deter those who might be tempted." *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. at 643. They are a useful remedy for litigants, like Plaintiff, "confronted by an obstructionist adversary," and maintain order and efficiency in the administration of justice. *See Remexcel Managerial Consultants, Inc.*, 583 F.3d at 51 (internal quotation marks omitted) (quoting *KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 13 (1st Cir. 2003); *see also*, *Hooper-Haas*, 690 F.3d at 38. Rosenthal's behavior is obstructionist and must be deterred. Otherwise, it will continue unabated. Plaintiff therefore requests the following:

(1)    a 90-day extension to all Scheduling Order deadlines, so that discovery might finally be completed;

(2)    Costs and Sanctions for Discovery Abuse; and

(3)    Any other relief the Court deems just, including but not limited to judgment, damages, costs, interest, and attorney's fees.

Respectfully submitted,

Plaintiff, by his Attorney,

/s/ *Kathy Jo Cook*
Kathy Jo Cook, BBO #631389
Benjamin H. Duggan, BBO #684981
Julie N. DeNardo, BBO #707101
Peter R. Chandler, BBO #703139
Sheff & Cook, LLC
10 Tremont St., 7th Floor
Boston, MA 02108
(617) 227-7000
kjcook@sheffandcook.com
bduggan@sheffandcook.com
jdenardo@sheffandcook.com
pchandler@sheffandcook.com

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(d), Plaintiff requests a hearing on the motion.

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(a)(2), I hereby certify that I conferred in good faith with all counsel on April 7, 2026 and on April 8, 2026 regarding this motion.

## CERTIFICATE OF SERVICE

I hereby certify that I caused to have served a copy of the foregoing document upon all parties of record via email on April 8, 2026.

/s/ *Kathy Jo Cook*
Kathy Jo Cook

19